IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE JOHN A. MENDEZ, JUDGE

---oOo---

LESLIE NAPPER, et al.,

        Plaintiffs,

vs.                      No. Civ. S-10-1119

COUNTY OF SACRAMENTO, et
al.,

        Defendants.

_____/

---oOo---

REPORTER'S TRANSCRIPT

COURT'S RULING

WEDNESDAY, JULY 21, 2010

---oOo---

Reported by:     KELLY O'HALLORAN, CSR #6660

APPEARANCES

For the Plaintiff:


        DISABILITY RIGHTS CALIFORNIA
        3580 Wilshire Blvd., Suite 902
        Los Angeles, CA  90010
        BY:  MELINDA BIRD

        WESTERN CENTER ON LAW & POVERTY
        3701 Wilshire Blvd., Suite 208
        Los Angeles, CA  90010
        BY:  ROBERT D. NEWMAN


For the Defendant:

        COUNTY OF SACRAMENTO
        OFFICE OF THE COUNTY COUNSEL
        700 H Street, Suite 2650
        Sacramento, CA  95814
        BY:  MICHELE BACH
             RICK HEYER
             JANE R. POWELLS-MAYS

For the United States:

        U.S. DEPARTMENT OF JUSTICE
        950 Pennsylvania Avenue, N.W.- NYA
        Washington, D.C.  20530
        BY:  REGAN RUSH
             Trial Attorney

1          SACRAMENTO, CALIFORNIA

2          WEDNESDAY, JULY 21, 2010

3               ---oOo---

4          (Excerpt of proceedings.)

5          THE COURT:  Okay.  All right.  I am prepared to rule

6     on the motion for a preliminary injunction.  In this case,

7     there is also, as the plaintiffs have mentioned, a motion for

8     class certification.  I'll address that at the end.

9          As we've indicated, and I did not obviously have a lot

10    of argument with respect to balance of hardships and public

11    interest, but again, those have been adequately briefed.  I

12    don't have any questions.  And that is really a matter of law

13    as opposed to raising questions dealing with the facts of

14    this case.  But I will address those as well.

15         Again, the plaintiffs are required to establish a

16    likelihood of success on the merits of their claims, that the

17    plaintiffs are likely to suffer irreparable harm in the

18    absence of preliminary relief, the balance of equities tips

19    in favor of the plaintiffs, and that an injunction is in the

20    public interest.

21         Title II of the Americans with Disabilities Act, which

22    governs public programs such as those involved in the case at

23    issue, provides as follows:  That "no qualified individual

24    with a disability shall, by reason of such disability, be

25    excluded from participation in or be denied the benefits of

1    the services, programs, or activities of a public entity, or

2    be subjected to discrimination by any such entity."

3           The Ninth Circuit has emphasized that "the ADA must be

4    construed broadly in order to effectively implement the ADA's

5    fundamental purpose of providing a clear and comprehensive

6    national mandate for the elimination of discrimination

7    against individuals with disabilities."  That's Barden vs.

8    City of Sacramento, a Ninth Circuit case 2002, 292 F.3d 1073.

9           A public entity is required to administrator services,

10   programs, and activities in the most integrated setting

11   appropriate to the needs of qualified individuals with

12   disabilities.  Unjustified isolation of persons with

13   disabilities, especially in institutions, is a form of

14   discrimination prohibited under the ADA and Section 504.

15   42 USC Section 12101.  This integration mandate requires that

16   persons with disabilities be served in the community when:

17   (1) the state's treatment professionals have determined that

18   community placement is appropriate; (2) that community

19   placement is not opposed by that individual; and (3) the

20   placement can be reasonably accommodated, taking into account

21   the resources available and the needs of others with

22   disabilities.  That's the Olmstead case, 527 U.S. 581.

23           "To state a claim under Title II of the ADA based on a

24   violation of the integration mandate, the plaintiff must

25   plead and prove as follows:  (1) that he or she is a

1    qualified individual with a disability; (2) that he or she

2    was either excluded from participation in or denied the

3    benefits of a public entity's services, programs, or

4    activities or was otherwise discriminated against by the

5    public entity; and (3) that such exclusion, denial of

6    benefits, or discrimination was by reasons of his or her

7    disability."  That's the Brantley vs. Maxwell-Jolly case,

8    656 F.Supp.2d 1161.  That's a Northern District of California

9    case decided last September 2009.

10         "Cases involving ADA integration claims have

11   recognized that the risk of institutionalization is

12   sufficient to demonstrate a violation of Title II."  That's

13   the Brantley case, citing to Fisher vs. Oklahoma Health Care

14   Authority, 335 F.3d 1175, a Tenth Circuit case 2003.  That

15   case held that Medicaid participants not currently

16   institutionalized but at high risk for premature entry into a

17   nursing home could bring claims for violations of the

18   integration mandate.

19         In this case before the Court, it's undisputed that

20   the plaintiffs are qualified individuals.  Plaintiffs have

21   argued that the defendants' hybrid plan is insufficient.

22   Plaintiffs assert "defendants must ensure not only that an

23   adequate replacement system is in place, but that there is

24   sufficient time and planning to enable clients to transition

25   successfully to the new system."

1          The plaintiffs have cited to the Brantley case, the

2     Northern District of California case, in which that court,

3     among other things, held that "proposed reduction of Medicaid

4     services likely would have placed indigent elderly persons

5     and adults with disabilities at serious risk of

6     institutionalization, and availability of alternative

7     services did not lessen the likelihood that proposed

8     reduction would have placed indigent elderly persons and

9     adults with disabilities at serious risk of

10    institutionalization."

11         In the Brantley case, the court stated that

12    "defendants have failed to implement any means of ensuring

13    that, if and when the cuts take effect, the necessary

14    alternative services will be identified and in place for

15    plaintiffs so that there will not be a period where they are

16    not receiving the care prescribed in the care plans.  Given

17    their precarious conditions, even temporary gaps in services

18    would present serious consequences for plaintiffs and place

19    them at great risk of being institutionalized."

20         Plaintiffs in this case have also argued that

21    defendants have not specified how they will replace the

22    services they are planning to eliminate and that their

23    transition plan is insufficient.  Plaintiffs have produced

24    evidence from experts, such as Dr. Franczak and

25    Ms. Stoneking, in which the declarations opine that "a

1   reasonably effective transition process, which allows time to

2   relocate clinic sites, transfer client records, train staff

3   and transition clients, would take a minimum of six months."

4   We've discussed that during the Court's questions.

5           Plaintiffs have argued that by "substituting

6   understaffed county clinics for existing programs, the county

7   will be eliminating key services that enable many patients to

8   access those programs, including transportation services,

9   assistance with maintaining housing, in-home visits and

10  hospital visits."

11          In a recent decision which both parties discussed in

12  their briefs, the V.L. vs. Wagner case, 669 F.Supp.2d 1106,

13  again another Northern District of California case, decided

14  in October 2009, that district court found as follows:

15  Plaintiffs have submitted substantial evidence from experts,

16  county officials, caregivers, and individual recipients

17  showing that, in that case it was a class action, that class

18  members face a severe risk of institutionalization as a

19  result of losing the services that, in that case the assembly

20  bill, would eliminate.  For instance, individuals with mental

21  disabilities who lose IHSS assistance to remind them to take

22  medication, attend medical appointments and perform tasks

23  essential to their continued health are at a severely

24  increased risk for institutionalization.

25          Defendants in the V.L. vs. Wagner case claim that

1     plaintiffs are not at risk of institutionalization because

2     some may have family members who may be able to take over the

3     care once provided by IHSS and some might find care through

4     some other community-based service.  However, defendants bear

5     the ultimate responsibility for ensuring the state's

6     compliance with federal disability law.  Thus, to the extent

7     that defendants are claiming that alternative services

8     satisfy their obligations under the integration mandate,

9     defendants certainly bear the burden of ensuring more than a

10    theoretical availability of such services.

11          And in that case the court concluded that plaintiffs

12    have shown a likelihood of success on the merits and that

13    defendants had violated the integration mandate.

14          In this case the defendants have argued that the

15    plaintiffs' declarations only demonstrate a fear of change

16    and not a real imminent risk of institutionalization.

17    Defendants have asserted that federal law does not require

18    that a service delivery system remain static merely because

19    consumers are fearful of change or will be unable to see the

20    same provider.

21          As the parties can tell from the Court's comments, I

22    disagree with that argument and that conclusion based on the

23    evidence before me.  I've expressed my concerns.  As a matter

24    of law, I think through the substantial evidence submitted by

25    the plaintiffs, from experts, caregivers, and the individual

1   recipients of these services, that this hybrid plan is

2   unlawful, is illegal in its present form.

3          There are a number of excellent suggestions that could

4   be incorporated into this hybrid plan.  If the county would

5   sit down with Ms. Dahlquist, Mr. Franczak, and Ms. Stoneking,

6   perhaps a system satisfactory to all and one that is lawful

7   could be developed.  But this was a top-down decision, as was

8   pointed out in the plaintiffs' papers.  And although there

9   were meetings held, input received, it's a plan that is, as

10  I've indicated already, a work in progress.  And I think it

11  began, as we've discussed, in part by that decision by the

12  Board of Supervisors to shift funds away from outpatient

13  services and toward its institutional budget.  There

14  obviously was a need, the board believed that that was

15  appropriate, and they made that decision.  There are a lot of

16  needs.  And in the budget process, it's almost an impossible

17  decision to decide what to fund and what not to fund.

18         The problem is that it appears that that's had a

19  snowball effect which has resulted in the county scrambling

20  to develop a hybrid plan, which in its present form clearly

21  violates the mandate, the integration mandate of the

22  Americans with Disabilities Act.

23         The plaintiffs have suggested, for example, that

24  crisis residential facilities could serve as an alternative

25  to institutional beds and possibly bring the county into

1   compliance with the Americans with Disabilities Act and other

2   applicable laws at issue in this case.

3           There is a lack of evidence from the county before

4   this Court that this current transition plan, this hybrid

5   plan, will, in fact, as a matter of an expert opinion,

6   eliminate the risk of institutionalization.  I think that

7   speaks volumes.  There is no disinterested expert witness

8   declaration from the defendants which has been submitted

9   which responds to, contradicts, or calls into question any of

10  the opinions or conclusions of the plaintiffs' experts.

11          Ms. Dahlquist's, Mr. Franczak's, and Ms. Stoneking's

12  supplemental declarations, in particular, the Court found to

13  be compelling, persuasive, and overwhelming evidence in

14  support of plaintiffs' position that this hybrid plan as

15  currently designed is illegal.

16          So the Court does find clearly that plaintiffs have

17  demonstrated a likelihood of success on the merits.  As to

18  whether the plaintiffs are likely to suffer irreparable harm,

19  the Court reaches the same agreement, that that element has

20  been proven as well.

21          The defendants have argued that the likelihood that

22  the plaintiffs will be institutionalized is speculative.  The

23  plaintiffs have, in the Court's opinion, presented ample

24  evidence from percipient and expert witnesses demonstrating

25  the danger of having to institutionalize plaintiffs and

1    putative class members if this hybrid plan is implemented.

2    And they've demonstrated that that risk is both real and

3    imminent.

4          In terms of the balance of harms favoring in granting

5    the motion, and the public interest being served by granting

6    the motion, the Brantley case is instructive.  On those two

7    elements, again, I find that the plaintiffs have satisfied

8    their burden as well.

9          As set forth in the Brantley case, the final two

10   inquiries in a preliminary injunction hearing is whether the

11   balance of hardships tips sharply in plaintiffs' favor and

12   whether the public will benefit from the proposed preliminary

13   injunction.  These factors may be viewed together.  See

14   Independent Living Center of Southern California, Inc. vs.

15   Maxwell-Jolly, 572 F.3d 644, at 657-58, Ninth Circuit 2009.

16   In a case such as the present where the issue concerns the

17   proposed reduction in medical benefits to indigents due to

18   budgetary concerns, the Ninth Circuit has recognized that

19   both the balance of hardships and public interest favor

20   plaintiffs.

21         In Independent Living, the Ninth Circuit affirmed the

22   district court's order granting the plaintiffs' motion for

23   preliminary injunction to enjoin the California Department of

24   Health Care Services, the same defendant in Brantley, from

25   implementing payment reductions to Medi-Cal providers as a

1     result of California's budgetary woes.  In discussing the

2     balance of hardships, the Ninth Circuit held that financial

3     considerations due to the state's fiscal crisis were

4     outweighed by the robust public interest in safeguarding

5     access to healthcare for those eligible for Medicaid, whom

6     Congress has recognized as "the most needy in the country."

7     See also Beltran, 677 F.2d at 1322.  Balancing the medical or

8     financial hardship to the plaintiffs against the financial

9     hardship to the state resulting from its inability to recover

10    for medical services should its rules ultimately be held

11    valid, it was not an abuse of discretion for the district

12    judge to find that the balance of hardships tipped sharply in

13    favor of plaintiffs.

14          As the Brantley court concludes, and as I conclude,

15    given these considerations, the court finds that the balance

16    of hardships and public interest favor plaintiffs.  I so find

17    as well in this case.

18          Which leads to the question raised by Ms. Bird as to

19    what should this injunction look like.  Because I am aware,

20    conscious of, and very cautious that this Court is, as I

21    started out this hearing, a court, not a political entity.

22    And so the form of the injunction proposed by the plaintiffs

23    I think is overbroad and would make this Court, in effect, a

24    member of the County Board of Supervisors.  That, I

25    respectfully decline.

1          And so I think this injunction should parallel what

2    was done in Brantley.  And I would suggest the following

3    language.  The language would be as follows:  That the

4    defendants and their respective successors in office, agents,

5    servants, employees, attorneys, and all persons in active

6    concert therewith, are preliminarily enjoined from

7    implementing or enforcing the hybrid plan approved by the

8    Sacramento County Board of Supervisors on or about, and I

9    think it was June 17, 2010, until and unless the Court has

10    determined that plaintiffs and all current and future adult

11    recipients of Medi-Cal funded outpatient mental health

12    services in the County of Sacramento will continue to receive

13    these outpatient mental health services in the most

14    integrated setting possible so as to avoid

15    institutionalization and/or treatment through hospital

16    emergency rooms.

17          I think that's as far as I can go at this point.  As

18    Ms. Bach has persuasively argued, as to how the Court's order

19    is implemented and as to how the county is going to bring

20    itself into compliance with the mandates of the Americans

21    with Disabilities Act and the Court's preliminary injunction,

22    that's up to the Board of Supervisors in consultation with

23    its attorneys.  Everyone in this court knows that if this

24    Court's injunction is being violated, I'm sure you'll be

25    right back here asking for further guidance and further

1    orders.  We're not there yet.

2         Also in the Brantley case, the court included the

3    following in its preliminary injunction.  It ordered that the

4    defendants were ordered to take all actions necessary within

5    the scope of their authority to implement the above

6    injunction; provide prompt notice to all plaintiffs, and in

7    this case putative class members, of the terms of this

8    preliminary injunction; and provide prompt notice to all

9    adult recipients of Medi-Cal funded outpatient mental health

10   services in the County of Sacramento of the terms of this

11   preliminary injunction.  That should be included in the

12   preliminary injunction order as well.

13        And then there's the issue of bond, which always comes

14   up.  And in this case, I believe that bond should not, as a

15   matter of law, be required.  As in the Brantley case and in

16   this case, I would as well waive the requirement for the

17   posting of bond as security for the entry of the preliminary

18   injunctive relief on the grounds of the plaintiffs'

19   indigency.

20        That's what the order should be.  That is, in fact, my

21   order.  And I would ask plaintiffs to prepare the form of the

22   order consistent with my comments here today.  You can order

23   a copy of the transcript, or whatever you need, and run it by

24   the defendants to make sure that it's appropriate and

25   approved as to form.

1              In terms of the motion to certify the class, it's I

2        think premature, and I don't think it's necessary at this

3        point.  And that was discussed in the briefs.  So long as I

4        included in the order itself the language that I think was

5        suggested by the plaintiffs, and all current and future adult

6        recipients of the Medi-Cal funded outpatient mental health

7        services.  I think that covers your concerns.  If it doesn't,

8        I'll hear from you further.  But I don't think at this point,

9        given this early stage of the litigation, that I'm prepared

10       to rule on the motion for class certification.  I have some

11       questions about whether this is an appropriate class action

12       or not.  The main question being no two people who suffer

13       from mental illness are alike.  And one of the defenses I

14       always see in class action motions is exactly that.  That

15       this is a case that is going to involve individual issues,

16       defenses that may be appropriate to one set of plaintiffs but

17       not to the other.  And all that isn't explored in this

18       certification.  We're too early in the process.  But I think

19       the language I suggested in the proposed preliminary

20       injunction would cover that.

21              Agree or disagree?

22              MS. BIRD:  For now, your Honor, I think that the order

23       that you've described addresses our concerns about class

24       certification.  I do have a concern, and perhaps it's just a

25       clarification, to try and save the Court's time in the

1    future.  As I understand it, the Court is enjoining the

2    county from implementing or enforcing the hybrid plan unless

3    and until certain events occur.

4         At present, based on a declaration the county

5    submitted from Mr. Kennedy, Exhibit C, they do have a

6    contract with the regional support teams for services at the

7    current level of services that ends July 31st.

8         Is it the Court's opinion that this injunction would

9    require the county to continue the status quo?

10        MS. BACH:  Let me, before you answer, your Honor,

11   because I need to clarify.  There is no contract.

12        THE COURT:  Okay.  I'm not rendering an opinion.

13   That's hypothetical, at least in my view.  But my injunction,

14   preliminary injunction, is clear that they can't do anything

15   to implement or enforce this plan.  As to how they bring this

16   into compliance is up to the county.  I can suggest that they

17   go back to the old system, but it's only a suggestion.  I'm

18   not mandating it.  I'm not ordering it.  The county knows

19   what it needs to do.  How it gets there is up to them.  It

20   may mean they have to revisit this decision to transfer $3.2

21   million to SMHTC.  Everything is on the table.  Unfortunately

22   for the county, they're back to square one.  And that means

23   they've got some really hard decisions to make.  That's why

24   my suggestion is exactly what you suggested, but I'm not

25   going to order a formal settlement conference.  I think

1    you're too early.  But I think the county should encourage

2    participation by the Stonekings and Franczaks and Dahlquists

3    of the world and take another look at what they're trying to

4    implement.  I think the county is headed down the right path,

5    but it's got to be a path that can guarantee that we're not

6    going to increase the risk of institutionalization.  The

7    hybrid plan isn't going to do that.  And I, for lack of a

8    better term, have blown up this hybrid plan.  It's gone.  If

9    the county continues to go down this path, my guess is you'll

10   be in here on July 31st, and I'll have to issue a somewhat

11   different order.  And then we'll get into this issue of

12   whether I really can do that as a court or whether I'm

13   prohibited because courts can't act as a legislative body.

14   I'm very sensitive to that issue.  And I trust that the

15   county will do the right thing.  They've got a court order

16   that says go do the right thing.  That's why they're elected,

17   and that's why they're a separate branch of government.  Let

18   them do their job.  If they're not doing their job,

19   unfortunately, then I guess I'll have to get involved again.

20   I don't want to be the mental health czar, and I reject and

21   refuse that role.  I'm a judge.  I'll do what I can to make

22   sure that parties, political entities, are in compliance with

23   federal law.  That's my job.

24        Question.

25        MR. NEWMAN:  Your Honor, if I might, and I was taking

1    notes on everything you wanted in the order, but my one

2    concern is I didn't hear, or perhaps I didn't write it down,

3    any proviso about how the county should continue to provide

4    medically necessary services to members of the putative

5    class.  And what you've done is you've told them to stop

6    doing X, and you've also been mindful of the limits on your

7    power, and you've told them they don't have to contract with

8    the RSTs.  But what I didn't hear was any proviso that will

9    at least provide these members of the class with what are

10   their medically necessary outpatient mental health services.

11          THE COURT:  In my view, that's an order that says

12   comply with the law.  I don't think you need that in a

13   preliminary injunction.  Again, it goes back to they know

14   what their responsibilities are.  And again, I think -- I

15   don't know if you heard me, but I said the injunction should

16   include the following language:  Take all actions necessary

17   within the scope of their authority to implement the above

18   injunction.

19          MR. NEWMAN:  Your Honor, that covers it.  Thank you.

20          THE COURT:  Okay.

21          MS. BACH:  I do have a clarification.

22          THE COURT:  Go ahead.

23          MS. BACH:  In terms of the definition of who is

24   provided notice, you essentially accepted the language that

25   was proposed by plaintiffs in terms of all current and future

1      recipients of outpatient mental health services.

2              THE COURT:  Adult.

3              MS. BACH:  Adult.  I'm sorry.  And that was the

4      definition they proposed for the class.  And the comment that

5      I was going to make to this Court, and I make it now, is that

6      it's still very broad, especially when you're talking about

7      giving notice because, as the declarations indicate, there

8      are somewhere in the neighborhood of 1,700 consumers who

9      receive services through what's known as the full service

10     partnerships.  And those are not and never have been impacted

11     or proposed for this hybrid model.  And so I would suggest

12     that instead, perhaps the best approach would be, if you were

13     going to require us to give notice, to give notice to the

14     existing clients of the RSTs or the other organizations

15     impacted by the hybrid.  Because otherwise we're talking

16     about giving notice to folks who don't know anything about

17     what's going on.  And talk about aggravating stress, that

18     would do it.

19             THE COURT:  I didn't follow.

20             MS. BACH:  I guess my point is I understand your

21     Honor's instruction that we give notice about the injunction.

22     That injunction is applicable only to the consumer population

23     receiving services at the RSTs.  It is not applicable to

24     other parts of the adult outpatient service system.  And so

25     I --

 1          THE COURT:  No, that's not accurate.  It has to

 2   include everyone.  TCORE, Wellness and Recovery Centers,

 3   RSTs.  I'm not limiting it to RSTs, which is I guess close to

 4   4,000 people.

 5          MS. BACH:  What I'm trying to clarify is there is the

 6   RSTs, the TCORE, et cetera, the organizations and programs

 7   that were impacted by the hybrid model.  But we have a whole

 8   group of other outpatient programs that were never subject to

 9   this hybrid model because they're MHSA programs or otherwise,

10   and the full service partnerships, which have 1,700 hundred

11   people in them, which are not included in the 4,000 you're

12   talking about.

13          THE COURT:  Do you agree with that, they're not

14   included?

15          MS. BIRD:  Your Honor, if it is excluding only the

16   people in the full service partnerships, yes, we're agreeable

17   with that.  There's so many programs that are being affected.

18          THE COURT:  My suggestion is that is something you two

19   need to work out in terms of the language of the final

20   preliminary injunction.  And if there is still disagreement,

21   then come back and I'll work it out with you.  But it seems

22   to me like you've got agreement on that point.  I think you

23   can agree if you sit down and work it out.  If there's such

24   disagreement that you need me to get back involved, I'll get

25   involved again.

1          Okay?

2          MS. BIRD:  Thank you, your Honor.

3          THE COURT:  All right.  Thank you all.

4          (Proceedings concluded at 12:05 p.m.)

1            I certify that the foregoing is a correct transcript

2      from the record of proceedings in the above-entitled matter.

3

4

5                          /s/ Kelly O'Halloran

6                          KELLY O'HALLORAN, CSR #6660

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25